IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MALIK BALLARD, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 14-4740 |
| | : | |
| THE CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| | : | |

**Jones, II    J.**                                                                 October 26, 2015

## **MEMORANDUM**

In his Complaint, (Dkt No. 1, Complaint [hereinafter Compl.]), Malik Ballard ("Plaintiff") sued the City of Philadelphia ("the City"), Police Commissioner Charles Ramsey ("Cmmr Ramsey"), Detective Edward Keppol ("Det. Keppol"),[1] Detective Palumbo ("Det. Palumbo"), Officer Edward M. Ashburn ("P.O. Ashburn"), and various John Doe Defendants.

In his Complaint, Plaintiff alleged that (1) Defendant Detectives/Officers subjected Plaintiff to excessive force, false arrest, false imprisonment, malicious prosecution, and violation of Plaintiff's due process and equal protection rights in violation of 42 U.S.C. § 1983 and § 1985, (Count I, Compl. ¶¶ 32-34); (2) various theories of liability for a *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) claim against the City of Philadelphia; and (3) various state law causes of actions against the individual Defendants. (Count II, Compl. ¶¶ 38-39.) Plaintiff demands compensatory and punitive damages, attorneys' fees and costs, and "Injunctive Relief to amend the Policy that hides the names of Police witnesses." (Compl. ¶ 39.)

On April 9, 2010, upon consideration of the City, Cmmr Ramsey, and P.O. Ashburn's Motion for Partial Judgment on the Pleadings, (Dkt No. 14), and attendant responses and replies thereto, the Court dismissed all claims against Cmmr Ramsey and P.O. Ashburn, and limited the claim against the City to the theory of liability that the City's Policy caused Defendants to withhold exculpatory evidence from the probable cause determination process. (Dkt No. 23.)

On June 24, 2015, the City and Det. Keppol and Det. Palumbo (collectively ("Defendant Detectives") filed a Motion for Summary Judgment and supporting Memorandum of Law, (Dkt

---

[1] Prior filings referred to Defendant as "Det. Keppel." In filings related to the Motion for Summary Judgment, the parties both used the spelling "Det. Keppol." The Court will refer to Defendant as such.

1

No. 27 [hereinafter MSJ]), and a Statement of Undisputed Material Facts. (Dkt No. 27-1 [hereinafter SOF].) Plaintiff filed a Response to Defendants' Statement of Undisputed Material Fact, (Dkt No. 31 [hereinafter RSOF]), a Memorandum of Law, (Dkt No. 31-3 [hereinafter Resp.]), and a Statement of Additional Disputed Material Facts. (Dkt No. 31-2 [hereinafter ASOF].) On August 23, 2015, Defendants filed a Response to Plaintiff's Statement of Additional Disputed Material Facts. (Dkt No. 33 [hereinafter RASOF].) On September 14, 2014, Defendants' filed a Reply Memorandum of Law. (Dkt No. 37 [hereinafter Rep.].)

Further, on August 22, 2015, Defendants filed a Motion to Exclude certain exhibits submitted by Plaintiff as evidence in opposition to Defendants' Motion for Summary Judgment. (Dkt No. 32.) On September 22, 2015, the Court denied this Motion. (Dkt No. 38.)

Upon consideration of the record, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. The Court GRANTS Defendants' Motion to dismiss all claims against the City of Philadelphia. The Court DENIES Defendants' Motion to dismiss the claims against Det. Keppol and Det. Palumbo for § 1983 claims for false imprisonment, false arrest, malicious prosecution and a supplemental state-law claim for false imprisonment. All other claims, insofar as such claims are still pending, are DISMISSED.

## I. Standard of Review

Under Fed. R. Civ. P. 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. A dispute is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does

not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## II. Factual Background

### a. The Underlying Incident

On April 26, 2012, at approximately 11:48 PM, Rasheed Coffey[2] was shot eight times at 2405 N. Bancroft St. (Affidavit of Probable Cause for Arrest Warrant, Dkt No. 27, Ex. A [hereinafter Aff. Prob. Cause].)

On April 27, 2012, at 12:25 AM, Mr. Coffey was interviewed by Detective Repici and signed a statement that stated in relevant part:

> Q. I am Det. Repici, tell me what happened earlier tonite [*sic*]?
>
> A. I was standing on corner of Bancroft and York Sts. talking on the phone: I seen [*sic*] two dudes come up from 16th St. They walked past, my back was turned and I got shot. I tried to run, I fell and then I got up and ran to my mom's house.
>
> […]
>
> Q. What these guys look at [*sic*]?
>
> A. They were hoods, I can't tell you.[3]

(Investigation Interview Record, April 27, 2012, Dkt No. 27, Ex. B [hereinafter April 27th Int.].)

On June 12, 2012, Police Officer Jesus Cruz ("P.O. Cruz") found that the gun used to shoot Mr. Coffey was used in a prior shooting on January 27, 2011 in the area of 5600 Chew Avenue. (Firearm Identification Unit Report, June 12, 2012, Dkt No. 31, Ex. G [hereinafter Firearm Rpt.]; Philadelphia Police Dept. Investigation Report of Jan. 27, 2011 Incident, March 18, 2011, Dkt No. 27, Ex. G.) Plaintiff has not been named as a suspect in this other shooting. (SOF ¶12; RSOF ¶ 12; Firearm Rpt.)

---

[2] Plaintiff intermittently refers to Mr. Coffey as "Mr. Coffee." The Court uses "Mr. Coffey" as that is the spelling found in the evidentiary record. (*See* Dkt No. 31, Ex. B; Dkt No. 31, Ex. E; Dkt No. 27, Ex. B.)

[3] The Court notes that in his Response, Plaintiff argues that this statement reflects an error in transcription. Plaintiff intimates that Mr. Coffey was stating that the persons who shot him were wearing hoods; rather than that they were "hoods," as such term is colloquially understood. (*See* ASOF ¶ 7.) There is nothing in the record to clarify exactly how Mr. Coffey meant his statement. While the Plaintiff's intimation is reasonable, the Court will not assume that there is a transcription error.

There remains a dispute of fact as to whether or not Defendant Detectives were aware of this ballistics report. (*Compare* SOF ¶ 11 *with* RSOF ¶ 11.) Defendant Detectives have testified that they were not aware of this ballistics report. (Ronald Palumbo, Deposition, May 14, 2015, Dkt No. 27, Ex. C [hereinafter Palumbo Dep.] 16:13-21.) To contradict such testimony, Plaintiff points to a prison phone call made by Mr. Coffey on November 2, 2012, wherein Mr. Coffey stated that:

> They came and grabbed me…They said the same shells that was [*sic*] found from my shooting was [*sic*] found on Rivera Street too….Yeah, my bullet got checked out….They trying to link that shit up….They trying to link that shit up to see who's a possible on everything…

(Mr. Coffey's Prison Calls Transcript, Dkt No. 31, Ex. E [hereinafter Prison Calls] 45:20-47:6.) Plaintiff argues that Mr. Coffey's language implies that he was told by Defendant Detectives about the ballistics report, which would of course mean that Defendant Detectives were aware of the report.

The Court notes that Mr. Coffey states that the police told him that the same shells were found in a shooting on "Rivera Street." The ballistics report in question refers back to a prior shooting on "Chew Avenue." Thus, Det. Palumbo's testimony that he was not aware of the Chew Avenue ballistics report does not necessarily mean that he was unaware of a Rivera Street report. However, assuming that Defendants appropriately provided all discovery, the only ballistics report in the record of which the Court is aware is the one regarding Chew Avenue. Thus, there is a reasonable argument that Mr. Coffey's statement that the police told him that his bullet was being "checked out" is a reference to the Chew Avenue ballistics report. There is also a reasonable argument that whatever Mr. Coffey was told was not a reference to the Chew Avenue ballistics report. Given this conflict in the factual record, the definitive determination on whether or not Defendant Detectives knew about this report is appropriately left for the jury.

On October 11, 2012, Mr. Coffey was arrested on gun charges, though he had not yet been charged. (SOF ¶ 16; RSOF ¶ 16; Mr. Coffey's PARS, Dkt No. 31, Ex. D.) On October 11, 2012, Defendant Detectives conducted an informal interview with Mr. Coffey. (Palumbo Dep. 17:15-21:23.) During this informal interview, Mr. Coffey told Defendant Detectives that Plaintiff had shot him. (Palumbo Dep. 21:3-15.) He also asked Defendant Detectives for help with his current arrest. (Palumbo Dep. 21:3-15.) Det. Palumbo testified that in response to this request, he told Mr. Coffey that he "had absolutely no power to do so." (Palumbo Dep. 21:10-11.)

Beginning at 8:35 PM, Mr. Coffey was formally interviewed by Defendant Detectives. (Investigation Interview Record, Oct. 11, 2012, Dkt No. 27, Ex. B [hereinafter Oct. 11th Int.].) At 9:15 PM, Mr. Coffey signed a statement that stated in relevant part that on April 26, 2012, after he was shot:

> I turn around and I look up I see Malik they call him "Bishop" with a black semi-automatic gun in his hands. He stood over me and he fired the gun six times at me. Hit me in the hip, groin and both my legs. I looked up at him and called him a pussy. Malik just looked at me and started running Westbound on York St.
>
> […]
>
> I couldn't tell who they were at first, but once the shooting started and they got up on me, I could teel [sic] the [sic] Malik shot me.
>
> […]
>
> I have known [Malik] since high school.
>
> […]
>
> [DET. KEPPOL: Det. Palumbo is going to show you eight photos. Is there anyone you recognize in those photo's [sic]?]
>
> Yes, Malik the top left photograph identified as (Malik Ballard PPN 939867) he is the one who shot me.
>
> […]
>
> All I know is Malik tried to kill me. He stood over me and kept shooting.

(Oct. 11th Int. at 1-2.)

Defendant Detectives printed a photo array for Mr. Coffey to review at 8:34 PM. (Photo Array, Dkt No. 27, Ex. D [hereinafter Photo Array].) The Court notes that the Photo Array was printed prior to the beginning of the formal interview. During his formal interview, Mr. Coffey circled Plaintiff's photograph in the photo array. (Photo Array.)

On October 13, 2012, Plaintiff was recorded saying the following in a prison phone call:

> That's what I told you what happened what I did trying to get – you know, say slide. They didn't work, but that's still security because now I can tell them, get me a check. You don't even have to worry about it. Even though I'm not going to do it. They be like when I even get close to that – man, that was a lie. I lied. I don't even know bull.
>
> […]

> I did that to try to get home early. It didn't work. It backfired. I lied. I don't even know him. I don't know who did like I kept telling y'all, and I just put a name, and y'all gave me a face, so I agreed with it.

(Prison Call 9:6-21.)

Defendant Detectives continued their investigation of the incident. Defendant Detectives checked and found that Plaintiff was not incarcerated at the time of Mr. Coffey's shooting. (SOF ¶ 6; RSOF ¶ 6.) On October 17, 2012, Det. Keppol obtained a written statement from Police Officer Miguel Diaz ("P.O. Diaz"), the police officer who responded to Mr. Coffey's 9-1-1 call and transported Mr. Coffey to the hospital. (ASOF ¶ 18; RASOF ¶ 18; Interview Investigation Record, Miguel Diaz, Oct. 17, 2012, Dkt No. 31, Ex. K [Oct. 17th Int.].) P.O. Diaz's statement stated in relevant part that:

> We approached [Mr. Coffey] and asked him if he know [*sic*] who shot him. He was shaking his head and stated that he didn't know what they looked like.
>
> […]
>
> There were a few people out there [witnesses to the shooting] but no one could provide a description of the offender.

(Oct. 17th Int.)

On October 26, 2012, Det. Keppol requested that Mr. Coffey be brought down from prison for warrant service. (Prisoner's Bring Down, Oct. 26, 2012, Dkt No. 31, Ex. I.) As previously addressed, Mr. Coffey stated on a prison phone call on November 2, 2012 that during this October 26th bring down, certain police officers told him that shells found in his shooting were found in a different shooting, and that the police were trying to link the two shootings. (Prison Calls 47:4-8.) On this call, Mr. Coffey stated that he had been held all weekend and had been interviewed multiple times by the police. (Prison Calls 47:6-15.)

On November 8, 2012, Det. Keppol signed an Affidavit of Probable Cause related to this incident. The Affidavit stated, in relevant part to this Motion:

> ...Detective Repici and Sgt. Deanglo of Central Detectives responded to Temple Hospital[,] briefly interviewed the Complainant who stated he was standing on the corner of York and Bancroft Sts. talking on his cell phone[] [w]hen he was approached by a b/m male [*sic*] dressed in all black who began shooting at him. The Complainant tried to run but fell and crawled to his mother's house. The Complainant called police from his phone.

6

>   Members of Central Detectives responded to the crime scene located on the 2400 Block of Bancroft. Detectives processed the scene consisting of (8) eight 9MM, F.C.C.'s blood evidence which was recovered from the highway and placed on property receipts.
>
>   […]
>
>   On 10/11/12, the Complainant was formally interviewed by Detectives Keppol and Palumbo of Central Detectives SIU. The Complainant stated he was on the corner of York and Bancroft Sts. when he observed (2) two b/m's dressed in black walking westbound on York St. approaching Bancroft. The Complainant turned his back on the males at which time he heard (1) one gunshot and tried to run. The Complainant then heard another gunshot and he was hit. The Complainant fell to the sidewalk looked up and saw a male he knows from the nieghborhood [*sic*] Malik nicknamed "Bishop" with a black semi-automatic handgun in his hand. The offender Malik stood over the Complainant and fired approximately six times hitting the Complaint in both legs and groin area. Malik then ran westbound on York St. The Complainant further stated that the second male who was with Malik was across the street also shooting at the Complainant who he cannot identify.
>
>   On 10-11-12, inside Central Detectives SIU the Complainant was shown a suspect photo array at which time the Complainant did identify offender (Malik Ballard PPN 939867) as the male he knows as Malik nicknamed "Bishop" who shot him on the highway 2400 Bancroft St. The Complainant further stated he has known the offender since high school.

(Aff. Prob. Cause at 2.)

The Affidavit did not contain the following information:

- The April 27, 2012 interview with Mr. Coffey, hours after the shooting, in which he told Det. Repici that he couldn't tell the police what the shooters looked like;
- The June 12, 2012 ballistics report that found that the gun used to shoot Mr. Coffey was used in a prior shooting on January 27, 2011;
- The fact that Plaintiff was not a suspect in the January 27, 2011 shooting;
- The fact that Mr. Coffey was in custody, but had not yet been charged, at the time of the October 11, 2012 interview;
- Mr. Coffey's request during the October 11, 2012 informal interview, prior to the formal interview, for help with his arrest;
- The fact that Defendant Detectives showed Mr. Coffey Plaintiff's photograph prior to the formal photo array;[4]
- P.O. Diaz's October 17, 2012 statement to Det. Keppol that on the night of the shooting, Mr. Coffey stated that he did not know who shot him;
- The interviews between police and Mr. Coffey that occurred over the October 26, 2012 weekend.

---

[4] Plaintiff supports this "fact" with the evidence that Mr. Coffey stated on a prison phone call that "I just put a name, and y'all gave me a face, so I agreed with it." (Prison Call 9:6-21.) Plaintiff is putting special emphasis on the "a" part of that statement.

7

On November 8, 2012, Magistrate Judge Sheila Bedford, issued an arrest warrant for Plaintiff based on the affidavit of probable cause. (Arrest Warrant, Dkt No. 27, Ex. E [hereinafter Arrest Warrant].)

On November 9, 2012, the arrest warrant was executed. (Philadelphia Police Department Arrest Report, Dkt No. 31, Ex. L [hereinafter PARS].) The Philadelphia Police Department Arrest Report ("PARS") states that the police personnel involved in the incident were Det. Keppol, Det. Palumbo, and P.O. Ashburn. (PARS at 1-2.)

On November 27, 2012, at a preliminary hearing, Judge Craig Washington held the case for Court and set formal arraignment on December 18, 2012. (Municipal Court Docket, Dkt No. 27, Ex. H [hereinafter Mun. Ct. Dkt.] at 3.) On November 28, 2012, formal arraignment was canceled. (Mun. Ct. Dkt. at 4.) On April 16, 2013, the District Attorney's Office requested the Court to *nolle prosequi* the charges against Plaintiff. (SOF ¶ 21; RSOF ¶ 21.)

### b. The Policy

Plaintiff's claims concern a 2009 Philadelphia Police Department Overtime Management Memorandum (09-01) dated January 28, 2009, adopted while Cmmr Ramsey was in office, which stated the following: "Platoon commanders will be required to review and initial all arrest and investigative reports, including [Preliminary Arraignment Reporting System] reports, to ensure that only those officers/investigators who are necessary for the successful outcome of the case are listed." (Dkt No. 1, Ex. A.) The Philadelphia Police Department implemented a Standard Operating Procedure ("SOP") stating that: "Investigative supervisors shall review search and arrest warrants to ensure that the above practices are followed, and that each component of case management is handled by as few police personnel as possible, as needed to the successful prosecution of the case." (Dkt No. 1, Ex. B.)  Throughout this Memorandum of Law, the Court will refer to both procedures jointly as "the Policy."

### III. Discussion

As a preliminary matter, the Court finds that only Plaintiff's claims under 42 U.S.C. § 1983 for false imprisonment, false arrest, and malicious prosecution, and a supplemental claim under Pennsylvania law for false imprisonment remain against Defendant Detectives. Insofar as Plaintiff was still pursing any additional claims against Defendant Detectives, such claims are DISMISSED.

### a. Defendants' Motion for Summary Judgment on all claims against the City is GRANTED.

#### i. Legal Standard

Municipal liability arises under § 1983 only when a constitutional deprivation results from an official policy or custom. *Monell*, 436 U.S. at 691-94. To prevail on a claim under § 1983, a plaintiff must establish that he was deprived of a constitutional right. *See Harvey v. Plains Twp. Police Dep't,* 635 F.3d 606, 609 (3d Cir. 2011). Under *Monell*, a plaintiff can show that a policy existed "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).

Beyond proving that an unlawful policy existed, a plaintiff must also demonstrate that "such a policy or custom was the proximate cause of the injuries suffered." *Patterson v. City of Philadelphia*, 2009 WL 1259968, at *10 (E.D. Pa. 2009) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). "'A sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom.'" *Bielevicz*, 915 F.2d at 851 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)).

#### ii. Analysis

On April 9, 2015, the Court limited Plaintiff's claims against the City to a theory of causation "that the City's Policy caused Defendants to withhold exculpatory evidence from the probable cause determination process leading to the false arrest and false imprisonment of Plaintiff." (Dkt No. 22 at 8.) Plaintiff has failed to provide sufficient evidence to sustain this claim. There is not sufficient evidence in the record to show a causal connection between the Policy and Defendant Detectives' behavior. All claims against the City are DISMISSED.

### b. Issues of fact persist as to whether or not probable cause existed at the time of Plaintiff's arrest.

#### i. Standard of Review

Defendants move to dismiss all claims against Defendant Detectives on the theory that probable cause existed for Plaintiff's arrest. (MSJ at 4-8.) To prevail on claims for false arrest, false imprisonment, or malicious prosecution under § 1983, and for false imprisonment under

Pennsylvania state law, Plaintiff must show that Defendant Detectives acted without probable cause.

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude than an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). "A police officer may be liable for civil damages for an arrest if 'no reasonably competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Typically, the existence of probable cause in a § 1983 action is a question of fact. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)). However, the Court may find that "probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Id.* Any "credible evidence contrary to the moving party's version of events will defeat the summary judgment motion." *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 908 (3d Cir. 1984).

In this case, Plaintiff was arrested pursuant to an arrest warrant. "An arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest." *Wilson*, 212 F.3d at 786 (citing *Sherwood*, 113 F.3d at 399). Plaintiff must prove, by a preponderance of the evidence "(1) that the affiant knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Sherwood*, 113 F.3d at 399 (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Frost*, 999 F.2d 737, 742-43 & n. 2 (3d Cir. 1993)). "To determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at 789 (citing *Sherwood*, 113 F.3d at 399).

### ii. Analysis

First, the Court finds that there remains a material dispute of fact as to whether or not Defendant Detectives included Mr. Coffey's identification of Plaintiff despite knowing of its falsity, or with reckless disregard for its falsity. Plaintiff has pointed to a statement made by Mr. Coffey on a prison phone call to demonstrate that Mr. Coffey was pressured by Defendant

10

Detectives into identifying Plaintiff. Referring to his interview with Defendant Detectives on October 11, 2012, Mr. Coffey stated that "I lied. I don't even know him. I don't know who did like I kept telling y'all, and I just put a name, and y'all gave me a face, so I agreed with it." (Prison Call 9:6-21.)

Whether this statement provides evidence that Defendant Detectives pressured Mr. Coffey into identifying Plaintiff, or whether it corroborates Defendant Detectives argument that Mr. Coffey identified Plaintiff of his own volition, is a matter of character and factual determination best left to a jury. Thus, the Court finds that there remains a material dispute of fact as to whether or not the inclusion on the Affidavit of Mr. Coffey's identification of Plaintiff as his shooter reflected Defendant Detectives' knowing inclusion of a falsehood.

Further, even assuming that the jury does not find that Defendant Detectives pressured Mr. Coffey, the record still contains additional evidence that may allow a fact finder to find that Defendant Detectives acted with reckless disregard for the truth by including Mr. Coffey's identification of Plaintiff in the Affidavit. There is evidence in the record that may show that Defendant Detectives knowingly excluded certain information from the Affidavit. For example, Defendant Detectives may have known about: Mr. Coffey's prior statement to Det. Repici in which Mr. Coffey stated that he did not know who shot him, and the testimony of the police officer on the scene who corroborated that Mr. Coffey did not identify his shooter on the night of the shooting, and the ballistics report that found that the gun used in the shooting of Mr. Coffey was also used at a different shooting (an event in which Plaintiff was not named as a suspect). There is evidence that Defendant Detectives knew that Mr. Coffey had requested help with his arrest at the meeting where he identified Plaintiff. Thus, factual issues, and issues of credibility, remain that are material to whether or not Defendant Detectives acted recklessly in including Mr. Coffey's identification of Plaintiff.

Mr. Coffey's identification of Plaintiff is material to the finding of probable cause. The Affidavit did not report any other witness identifications of Plaintiff, nor did it show any physical evidence linking Plaintiff to the crime. The Affidavit rested squarely on Mr. Coffey's identification of Plaintiff.

In conclusion, the Court holds that there remain material issues of fact as to whether or not Defendant Detectives acted knowingly, or recklessly, when they included Mr. Coffey's identification of Plaintiff on the Affidavit, and excluded evidence from the Affidavit that

contradicted, or questioned, the veracity of Mr. Coffey's identification. Thus, the Court cannot grant summary judgment on the theory that probable cause existed to support Plaintiff's arrest.

### c. Issues of fact persist as to whether Defendant Detectives are entitled to qualified immunity.

#### i. Standard of Law

To determine whether Defendant Detectives are entitled to qualified immunity, the Court considers: (1) whether the state actor violated a constitutional right, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 202, 201 (2001). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201. *Saucier* does not need to be applied rigidly; the Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 55 U.S. 223, 129 S. Ct. 808, 818 (2009).

"When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2085 (2011). The Court considers "the state of the existing law at the time of the alleged violation and the [specific] circumstances confronting the officer." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010). An officer is not liable where his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"[W]hen qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006).

#### ii. Analysis

The core right at issue in this case is the right not to be arrested, imprisoned, and prosecuted without probable cause. "A police officer…is ordinarily charged to know the probable cause requirement." *Losch*, 736 F.2d at 910 (quoting *Trejo v. Perez*, 693 F.2d 482, 488 n. 10 (5th Cir. 1982)). Therefore, "[if] an arrest lacks probable cause for its support it is, objectively speaking, in violation of clearly established law." *Id.* (quoting *Trejo*, 693 F.2d at 488 n. 10). Because material issues of fact remain in this case as to whether Defendant Detectives had probable cause, the Court cannot rule at this time on whether Defendant Detectives' actions were protected by qualified immunity.

### d. Plaintiff's malicious prosecution claim does not fail.

#### i. Standard of Law

To bring a malicious prosecution claim under the Fourth Amendment in Pennsylvania, Plaintiff must demonstrate that: (1) Defendant Detectives initiated a criminal proceeding; (2) the criminal proceeding ended in Plaintiff's favor; (3) the proceeding was without probable cause; and (4) Defendant Detectives acted maliciously or for a purpose other than bringing Plaintiff to justice. *Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir. 1996). In addition, Plaintiff must show that he suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).

In this case, the criminal proceeding ended with the government's request of *nolle prosequi*. A *nolle prosequi* can provide the requisite favorable termination "only when the[] final disposition is such as to indicate the innocence of the accused." *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (citing Restatement (Second) of Torts (1976) § 660 cmt. a). "A § 1983 malicious prosecution plaintiff must be innocent of the crime charged in the underlying prosecution." *Id.* (citing *Hilfirty*, 91 F.3d at 579-80).

#### ii. Analysis

Defendants argue that Plaintiff has failed to show: (1) that Defendant Detectives acted maliciously and (2) that the criminal proceeding ended in Plaintiff's favor. (MSJ at 9.)

First, the Court finds that there is sufficient dispute of facts regarding facts that materially relate to whether or not Defendant Detectives acted maliciously. There is a dispute of fact as to whether or not Defendant Detectives intimidated Mr. Coffey in any way leading to Mr. Coffey's identification of Plaintiff. Such evidence, if true, could be grounds upon which a jury could find that Defendant Detectives acted maliciously. The Court cannot grant summary judgment on this theory at this time.

Second, the Court finds that there is sufficient evidence in the record to support a finding that Plaintiff received a favorable termination. The record reflects that the government requested *nolle prosecui*. There is no evidence in the record to support any finding that Plaintiff was in fact guilty of shooting Mr. Coffey. Moreover, this case did not proceed to trial. The only evidence in the record that can explain the government's request for *nolle prosequi* is the lack of credibility of Mr. Coffey and his identification. Thus, the evidence would tend to indicate that the government believed in the innocence of Plaintiff.

**IV. Conclusion**

The Court GRANTS IN PART AND DENIES IN PART Defendants' Motion. First, the Court GRANTS Defendants' Motion as to all claims against the City; the City is DISMISSED from this case. Second, the Court DENIES Defendants' Motion as to claims for false imprisonment, false arrest, and malicious prosecution in violation of § 1983, and false imprisonment under state law, as to Defendant Detectives. Insofar as any other claims remain against Defendant Detectives, such claims are DISMISSED.

BY THE COURT:

/s/ C. Darnell Jones, II

_____

C. Darnell Jones, II    J.